IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
January 9, 2019 Session

## BRICE COOK v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Shelby County**
**No. 08-07496      Lee V. Coffee, Judge**

_____

## No. W2018-00237-CCA-R3-PC
_____

The petitioner, Brice Cook, appeals the denial of his post-conviction petition, arguing the post-conviction court erred in finding he received effective assistance of counsel at trial and on appeal. After our review of the record, briefs, and applicable law, we affirm the denial of the petition.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed

J. ROSS DYER, J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN, J. joined. JOHN EVERETT WILLIAMS, P.J., filed a separate dissenting opinion.

André C. Wharton, Memphis, Tennessee, for the appellant, Brice Cook.

Herbert H. Slatery III, Attorney General and Reporter; Brent C. Cherry, Senior Assistant Attorney General; Amy Weirich, District Attorney General; and Leslie Byrd and Leslie Fouche, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### Facts and Procedural History

On direct appeal, this Court summarized the facts surrounding the petitioner's conviction, as follows:

Following the shooting of the victim, the [petitioner] was indicted for first degree premeditated murder, and his brother, Terrance Washington, was indicted for facilitation of first degree murder. At the first trial, the State introduced evidence that the [petitioner's] ex-girlfriend, Jasmin Harris, had left him to pursue a relationship with the victim, and that, after

exchanging a series of text messages with the victim and Ms. Harris, the [petitioner] came to the victim's home and shot her in Ms. Harris's car. The [petitioner] and co-defendant were tried together by a jury in December 2009 and were both convicted as charged. The [petitioner] moved for a new trial based in part on certain surprise testimony from a police officer involving a statement made by the co-defendant. Although the [petitioner] testified at the December 2009 trial, the co-defendant did not, and the [petitioner] had no opportunity to cross-examine him regarding the statement. On August 30, 2010, the trial court granted the [petitioner's] motion for a new trial, finding a violation of the [petitioner's] right to confront witnesses against him under *Bruton v. United States*, 391 U.S. 123, 137 (1968).

At the new trial, the [petitioner] was tried separately from his brother and, on November 4, 2011, was again convicted of first degree murder.

. . .

The testimony at trial from the State's four eyewitnesses -- Henrietta Niter, a neighbor who saw the shooting from her bedroom window, and the victim's roommates, Ms. Harris, Mark Brown, and Anterio Bibbs -- established that the [petitioner] shot the victim. Ms. Harris and Mr. Bibbs testified that the victim had gone to pick up Mr. Bibbs and was returning with him to the townhouse when he heard loud talk and went outside to speak to the [petitioner] about a conflict between the [petitioner] and the victim. Ms. Harris and Mr. Brown testified that when the victim arrived, the [petitioner's] brother held Ms. Harris back. Ms. Harris, Mr. Brown, and Mr. Bibbs testified that Mr. Bibbs and the victim got out of the car. All four witnesses heard one or two initial shots, and Mr. Brown saw the shot, which he described as the [petitioner] firing "down the sidewalk." Mr. Bibbs testified he began to run away when he heard gunfire but returned when he realized the victim was not with him. Mr. Bibbs returned to the car and pled with the [petitioner] not to shoot the victim. All four witnesses testified that as the victim got back in the car and attempted to escape in the vehicle, the [petitioner] went up to the driver's side window and shot her twice. Ms. Harris testified that there may have been a third shot at that point. Mr. Brown heard the [petitioner] say, prior to shooting the victim, "Didn't I tell you I was gonna kill you?" and he also testified the [petitioner's] brother said, "You killed the B," and the [petitioner] said he did not care. Mr. Bibbs testified the [petitioner] said, "Yeah, now what?" before he shot the victim. Mr. Brown then saw the [petitioner] hand his

brother the gun, and Mr. Brown and Mr. Bibbs saw the [petitioner] and his brother leave in separate cars, one of which Mr. Brown testified was driven by a woman. One gunshot entered the victim's left abdomen, and the other entered her left lower back.

The State introduced a series of text messages that were exchanged on Ms. Harris's phone among the [petitioner], the victim, and Ms. Harris. Ms. Harris testified that the victim was using Ms. Harris's phone to text with the [petitioner], that the victim showed her the series of texts, and that she then exchanged texts with the [petitioner] on the same phone.

Ms. Harris's telephone stored the text messages she sent and received, and assigned each message a number sequentially. Outgoing text messages were numbered separately from incoming text messages. Ms. Harris's phone displayed the time that incoming messages were received, but did not include a time stamp on outgoing messages.

The [petitioner] did not object to the admission of photographs of Ms. Harris's phone displaying the messages but objected when the State asked Ms. Harris to interpret them. The trial court allowed Ms. Harris to give a lay opinion regarding the meanings of the texts, which were written in non-standard English using non-standard spelling.

. . .

Another witness for the State, Officer Edward Yancey, testified that when he arrived on the scene, Ms. Harris was continually screaming, "My boyfriend killed my girlfriend." She then gave him information regarding the [petitioner], including his mother's address, a description of his car, and the statement that his brother held her arms during the shooting. Officer Yancey then testified that a man in blue "told me basically the same thing that she did." The defendant objected, and a bench conference, much of which was apparently indiscernible to the court reporter, followed. While the court's ruling is not entirely clear, the judge ultimately stated, "So, any of those statements, at this point, unless there's a proper foundation, I will sustain the objection to hearsay; but (indiscernible)." No curative instructions regarding the testimony on the record about the statements of the man in blue were sought or given.

. . .

The [petitioner's] theory of the case was that he had acted in self-defense. Accordingly, the [petitioner] introduced the testimony of three witnesses who had not testified at the first trial and who came forward in 2010, approximately two years after the shooting. Justin Bowen, Reginald Temple, and Noel Jackson testified that the gunfire they saw appeared to be coming out of the driver's side of the vehicle. They also testified that the police had told them to leave without taking statements from them on the night of the shooting and that no one had subsequently asked them about the incident until the [petitioner's] new legal team made inquiries two years after the crime. They testified they did not have a close relationship with either the victim or the [petitioner] at the time of the shooting.

The [petitioner] argued that, during a delay prior to calling 911, the victim's three roommates had hidden a gun and perhaps other evidence which tended to show that the victim had fired the first shots. Mr. Brown and Mr. Bibbs testified that the victim was unarmed. However, the [petitioner] elicited testimony that Mr. Bibbs had recently traded the [petitioner] a TV for a gun, which he subsequently kept in the house, that there was some delay prior to the witnesses calling 911 at 12:40 a.m., and that the victim's personal effects, including a wallet and necklace she habitually wore, were given to her mother not by the hospital but by Ms. Harris.

During closing arguments, the defense focused on its theory of self-defense. The State interrupted counsel's arguments to object that the [petitioner] was mischaracterizing evidence, and the trial court instructed the jury that arguments of counsel should be disregarded if not supported by evidence. The State then addressed the defendant's theory of the case during rebuttal, proclaiming, "You can't shoot someone in the back and claim self-defense. Never in the history of mankind has someone been shot in the back and the shooter was defending himself." The defendant objected, but the trial court, rather than allowing counsel to elaborate on the basis for the objection, repeated the instruction that statements of counsel were not evidence to be considered by the jury and allowed the prosecution to continue with closing argument.

Because the trial court found that the text messages which the [petitioner] had sent to the victim could be construed as threats, it instructed the jury: "If from the proof you find that the defendant has committed acts other than that for which he is on trial, you may not consider such evidence to prove his disposition to commit such an alleged crime as that on trial."

The court instructed the jury that any prior acts the [petitioner] committed could be considered only insofar as they contributed to the complete story of the alleged crime, to show intent, and to show guilty knowledge. The instructions also allowed the jury to use such evidence to show motive, "[t]hat is, prior acts of violence or threats against the victim may be considered by you if it tends to show the [petitioner's] and victim's relationship; the [petitioner's] hostility toward the victim; malice, intent, motive and a settled purpose to harm the victim." The [petitioner] objected to this instruction, arguing that the evidence did not show any prior bad acts because the text messages were non-threatening. In closing argument, the prosecution brought out the threats in the text messages, and the defense argued extensively that the text messages were not threatening.

The jury convicted the [petitioner] of first degree murder, and he was given a life sentence. The trial court denied the [petitioner's] motion for a new trial.

*State v. Brice Cook*, No. W2012-00406-CCA-R3-CD, 2013 WL 9570493, at *1-7 (Tenn. Crim. App. Sept. 4, 2013), *perm. app. denied* (Tenn. Feb. 11, 2014).

After the denial of his direct appeal, the petitioner filed a timely petition for post-conviction relief, arguing, in part, trial counsel was ineffective for failing to timely communicate a plea bargain, failing to properly raise issues critical to the theory of self-defense, failing to request a mistrial after testimony regarding gunshot residue swabs and nail clippings, and failing to cross-examine Ms. Harris, the petitioner's ex-girlfriend, regarding her pending aggravated assault charges, and appellate counsel was ineffective for failing to raise the issue of the admissibility of the victim's mental health records. The petitioner also argued the State committed a *Brady* violation by failing to disclose the victim's mental health records and any promises made to Ms. Harris in exchange for her testimony. It appears from the record and the briefs filed by the parties that the petitioner filed an amended petition. However, such was not included in the record on appeal. Furthermore, when this Court ordered the record to be supplemented with the amended petition, the trial court clerk certified that no copy was to be found.

At the evidentiary hearing, lead counsel testified he was retained following the conclusion of the petitioner's first trial and filed a successful motion for new trial. He and co-counsel then represented the petitioner at both the second trial and on direct appeal. Lead counsel stated he had prolonged plea negotiations with the lead prosecutor, Mr. David Zak, but they were unable to come to an agreement prior to trial. However, if an agreement had been reached, lead counsel would have relayed that offer to the petitioner. His case notes indicated he spoke with Mr. Byron Cook, the petitioner's

father, on September 19, 2011, and proposed a plea of thirteen years, six months at 100 percent, but this was not a confirmed offer from the State.

Regarding his defense strategy, lead counsel discussed the petitioner's medical issues and possible intoxication with co-counsel but decided to go with a "clean cut self-defense" theory, specifically a first aggressor theory. However, several facts in the case posed a problem to this theory, including that the victim was shot in the back and the police did not find a gun in her possession. To combat these issues, lead counsel called three witnesses who testified they saw a flash coming from the victim's car, and lead counsel argued the victim's roommates hid her gun before calling 911. Regarding the gunshot residue swabs and nail clippings, lead counsel could not recall testimony at trial indicating why the testing was not done, and he acknowledged there was no downside to testing the evidence if it was likely to show gunshot residue on the victim.

Co-counsel testified she represented the petitioner at his second trial and on direct appeal. In her case notes, co-counsel discovered evidence of a "confirmed" offer for thirteen years, six months at 85 percent made on September 9, 2011. Her notes indicated lead counsel met with Byron Cook, the petitioner's father, on that date to explain the offer. Co-counsel then met with the petitioner on October 18, 2011, and, after hearing the offer, the petitioner was "very pleased." However, he later changed his mind and decided not to accept it.

When asked about the victim's nail clippings, co-counsel testified she could not recall that fact coming up at trial. In addition, co-counsel could not recall whether she knew Ms. Harris had been charged with a crime involving a firearm prior to the petitioner's trial. Co-counsel did remember discussing the petitioner's medical condition with the defense team, but only to ensure the petitioner's medical needs were met. If co-counsel believed the petitioner's medical condition had been a viable argument, she would have presented it to the jury. However, she did not feel the petitioner had any trouble "work[ing] with us, understand[ing] the case, understand[ing] the charges, understand[ing] the evidence, discovery, and understanding our conversations."

Regarding the victim's mental health records, co-counsel could not recall whether she attempted to obtain the records prior to trial, but remembered speaking with the trial court about obtaining them during the State's proof. After the trial court reviewed the records in camera and summarized them for the parties, co-counsel disagreed with the trial court's ruling that the evidence was not relevant to the petitioner's theory of first aggressor self-defense, especially the mention of homicidal tendencies. Although co-counsel initially testified she included this issue in the direct appeal, after reviewing the appellate opinion, she acknowledged it was not addressed. However, co-counsel testified there were several reasons why she may not have included this issue on appeal. Looking

- 6 -

back, this argument may not have been as strong as it first appeared during the trial, and she may have been concerned about the number of issues included in the appeal, preferring to focus on the strongest issues.

David Zak, the lead prosecutor at the petitioner's trial, testified he and lead counsel engaged in plea negotiations prior to trial, and it was his practice to let the defense approach him with any offers. In this case, Mr. Zak felt very strongly about the evidence because he had already obtained a conviction against the petitioner during the first trial. Therefore, he was not willing to come down as low as the defense wanted, and Mr. Zak stated unequivocally that he did not agree to any offers in this case.

Mr. Zak also testified he was aware the victim had spent time at a mental health facility shortly before the shooting, but could not remember who told him this fact or when he became aware of it. However, he believed the matter was fully investigated and "there was nothing to it." Mr. Zak recalled the victim's nail clippings coming up during the cross-examination of the medical examiner. However, he did not believe a gunshot residue test was necessary based on the close range of the shooting.

Byron Cook, the petitioner's father, testified he was in charge of making decisions regarding the petitioner's defense. When lead counsel approached him with plea offers, Mr. Cook would not consider anything he thought was too high because he thought the petitioner did not have long to live due to his medical issues. The lowest offer Mr. Cook remembered the State presenting was eighteen years. Although Mr. Cook did not believe any offers were conveyed to the petitioner, he acknowledged he was not present for every meeting the petitioner had with trial counsel. Mr. Cook also testified the petitioner suffers from mood swings when his diabetes is uncontrolled. Mr. Cook believed the petitioner's diabetes was not controlled at the time of the shooting because the petitioner was "hanging out" with his brothers, and Mr. Cook and his wife were unable to monitor the petitioner's medications.

Dr. James Walker, an expert in neuropsychology, testified he met with the petitioner twice for a total of two hours. An associate spent an additional four hours with the petitioner, performing neuropsychological testing. In addition to the interviews and testing, Dr. Walker reviewed records and spoke with the petitioner's brother, the co-defendant in this case. Testing indicated the petitioner's IQ was 77, which fell within the sixth percentile compared to an average man the same age. While the petitioner's verbal abilities tested in the low 70s, his visual perception skills were slightly higher. Due to these limitations, Dr. Walker opined the petitioner would have trouble performing anything other than "simple or low level detailed work." However, Dr. Walker acknowledged shooting a person in the back is a simple skill because you "simply point a gun and pull the trigger."

Dr. Walker also testified the petitioner was difficult to interview because he did not understand "how people are supposed to behave under this kind of circumstance." According to Dr. Walker, the petitioner would not react well to stressful situations. In addition, if a person is not controlling his diabetes properly, one can suffer from serious cognitive problems, including irritability, restlessness, agitation, difficulty controlling their behavior, impulsiveness, and lethargy. During his interview with Dr. Walker, the petitioner indicated he had not taken his diabetes medicine on the day of the shooting and had smoked a large amount of marijuana. Because of these factors and the text messages exchanged between the victim and the petitioner, Dr. Walker opined it was "certainly possible" the petitioner honestly believed the victim was a threat on the night of the shooting. However, Dr. Walker testified there is no indication that an insanity defense would have been supported in this case, and he was unable to definitively say the petitioner was incapable of acting with deliberation and judgement. Dr. Walker also acknowledged the information about the petitioner's marijuana use and dysregulated diabetes on the day of the shooting was self-reported by the petitioner.

The petitioner testified trial counsel visited him in jail "two or three times" but acknowledged meeting with them at each court date. A few days prior to his second trial, a man who said he worked with trial counsel came to see the petitioner in jail. The man, who the petitioner believed to be a lawyer, asked if he would be willing to "sign for a 13.5," which the petitioner believed to be an offer for thirteen years, six months. The petitioner told the man he was ready to sign, but the man stated the petitioner would need to wait until his next court date to sign the paperwork. However, when the petitioner arrived at court for his trial, lead counsel indicated the State "took the offer off the table." The petitioner testified he was frustrated that his father seemed to be in control of his defense because the petitioner "was the one doing the time." If he disagreed with his father about a plea offer, the petitioner stated he would consider his father's feelings but would "make up [his] own mind." The petitioner also testified he was not taking his medication properly at the time of the shooting. When his medication is not regulated, the petitioner stated he vomits, becomes dehydrated, and acts aggressively.

After its review of the evidence presented, the post-conviction court denied relief, and this timely appeal followed.

*Analysis*

On appeal, the petitioner argues trial counsel was ineffective for failing to promptly convey a confirmed plea offer, failing to renew their argument that the victim's mental health records were admissible, and failing to submit evidence of the petitioner's mental state and medical issues, and appellate counsel was ineffective for failing to raise

- 8 -

the issue of the victim's mental health records on appeal and failing to properly preserve the appellate record. The petitioner also argues the State committed *Brady* violations for failing to disclose the victim's mental health records, the gunshot residue swabs and nail clippings taken from the victim, and any offer made to Ms. Harris in exchange for her testimony. Finally, the petitioner argues the post-conviction court was unfairly biased against him.[1] The State contends the post-conviction court correctly denied the petition as the petitioner failed to meet his burden, and the petitioner failed to show the post-conviction court was unfairly biased against him. Following our review of the record and submissions of the parties, we affirm the judgment of the post-conviction court.

The petitioner bears the burden of proving his post-conviction factual allegations by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f). The findings of fact established at a post-conviction evidentiary hearing are conclusive on appeal unless the evidence preponderates against them. *Tidwell v. State*, 922 S.W.2d 497, 500 (Tenn. 1996). This Court will not reweigh or reevaluate evidence of purely factual issues. *Henley v. State*, 960 S.W.2d 572, 578 (Tenn. 1997). However, appellate review of a trial court's application of the law to the facts is *de novo,* with no presumption of correctness. *See Ruff v. State*, 978 S.W.2d 95, 96 (Tenn. 1998). The issue of ineffective assistance of counsel presents mixed questions of fact and law. *Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001). Thus, this Court reviews the petitioner's post-conviction allegations *de novo,* affording a presumption of correctness only to the post-conviction court's findings of fact. *Id.*; *Burns v. State*, 6 S.W.3d 453, 461 (Tenn. 1999).

To establish a claim of ineffective assistance of counsel, the petitioner must show both that counsel's performance was deficient and that counsel's deficient performance prejudiced the outcome of the proceedings. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *State v. Taylor*, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting that the standard for determining ineffective assistance of counsel applied in federal cases is also applied in Tennessee). The *Strickland* standard is a two-prong test:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

---

[1] For the sake of clarity, we have reordered and renumbered the issues from the order they appeared in the petitioner's brief.

466 U.S. at 687.  In order for a post-conviction petitioner to succeed, both prongs of the *Strickland* test must be satisfied.  *Id*.  Thus, courts are not required to even "address both components of the inquiry if the defendant makes an insufficient showing on one."  *Id*.; *see also Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996) (stating that "a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim").

A petitioner proves a deficiency by showing "counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms."  *Goad*, 938 S.W.2d at 369 (citing *Strickland*, 466 U.S. at 688; *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975)).  The prejudice prong of the *Strickland* test is satisfied when the petitioner shows there is a reasonable probability, or "a probability sufficient to undermine confidence in the outcome," that "but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Strickland*, 466 U.S. at 694.  However, "[b]ecause of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'"  *Id*. at 689 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)).

## I.     Trial Counsel

## A.     Plea Offer

The petitioner argues trial counsel was ineffective for failing to timely convey a plea offer, which the petitioner asserts he would have accepted instead of proceeding to trial.  The State contends the post-conviction court properly found the prosecutor did not make a plea offer to the petitioner.  The post-conviction court accredited lead counsel's testimony that he and the State were unable to reach an agreement.  As to this issue, the post-conviction court made the following findings:

> [Co-counsel] and [lead counsel] diligently and persistently attempted to negotiate a settlement for the [p]etitioner.  The State of Tennessee refused to allow the [p]etitioner to enter a guilty plea to voluntary manslaughter.  There is absolutely no proof that the State offered the [p]etitioner a plea agreement.  The [p]etitioner and his father both acknowledged that the [p]etitioner would not have entered a guilty plea to Second Degree Murder.  [Co-counsel] and [lead counsel] attempted to negotiate a settlement on voluntary manslaughter.  The [p]etitioner never accepted an offer to plead guilty because an offer was never made.

The post-conviction court accredited lead counsel's testimony and found that the State did not make a settlement offer to the petitioner. The record does not preponderate against the findings of the post-conviction court. Lead counsel testified he "drew out" a proposed offer with the petitioner's father, Mr. Cook, on September 19, 2011. However, lead counsel was unable to "come to an agreement" with Mr. Zak, the lead prosecutor, prior to trial. Mr. Zak corroborated lead counsel's testimony, stating he "didn't make [] an offer" in this case because he "had already tried the case once" and received a guilty verdict. Although co-counsel, the petitioner, and Mr. Cook each testified an offer was made, their testimony regarding the specifics of the offer differed. Co-counsel testified she met with the petitioner on October 18, 2011, to discuss a confirmed offer of thirteen years, six months at 85 percent. The petitioner "was very pleased with the offer" but later changed his mind. The petitioner's father, Mr. Cook, recalled Mr. Zak making an offer of eighteen years during the trial. The petitioner testified a man from trial counsel's office came to the jail a few days prior to trial and "asked [him if he] would sign for a 13.5." The petitioner told the man he would agree to the offer, but, when the petitioner arrived at court for trial, lead counsel told him the "offer was off the table." The post-conviction court accredited lead counsel's testimony, and this Court will not re-weigh its credibility findings. *See Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997).

Accordingly, we conclude the State did not make a plea offer to the petitioner. The petitioner has failed to show trial counsel was deficient in conveying plea offers and, therefore, is not entitled to relief on this issue.

## B.    Victim's Mental Health Records

The petitioner argues trial counsel failed to renew their argument that the victim's mental health records were admissible at trial. These records, according to the petitioner, were necessary for establishing a first aggressor theory of self-defense. The State contends the trial court properly determined the mental health records were neither relevant nor admissible because the records do not contain evidence of prior acts of violence. We agree with the State.

"Evidence of a person's character or trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion." Tenn. R. Evid. 404(a). However, if a defendant relies on a theory of self-defense, asserting the alleged victim was the first aggressor, the defendant may offer evidence of the victim's prior history of violent conduct. *State v. Ruane*, 912 S.W.2d 766, 781-82 (Tenn. Crim. App. 1995), *abrogated on other grounds by State v. Williams*, 977 S.W.2d 101, 105 (Tenn. 1998).

- 11 -

This Court has previously stated "[t]here is a distinction between evidence of prior acts of violence by the victim used to corroborate the defense theory that the victim was the first aggressor and that used to establish the defendant's fear of the victim." *Id.* at 779. If the defendant wishes to introduce evidence showing a reasonable fear of the victim, the defendant may testify about his knowledge of the victim's violent conduct. *Id.* However, if the defendant was unaware of the victim's prior violent acts, the evidence is admissible as corroborative evidence only. *Id.* at 781-82. In addition, before proof of first aggression may be admitted, the following requirements must be met:

> (1) self-defense must be raised by the proof and not by the words and statements of counsel;
>
> (2) the trial judge must determine whether or not there is a factual basis underlying the allegations of tendencies of first aggression; and
>
> (3) the trial judge must determine whether or not the probative value of the evidence is outweighed by the potential for unfair prejudice.

*See Id.* at 781.

At the evidentiary hearing, co-counsel testified she disagreed with the trial court's ruling that the victim's mental health records were inadmissible. However, she believed the matter was fully litigated at trial. The post-conviction court made the following findings:

> There is absolutely nothing in those privileged records that would indicate that they were relevant to any issues that this jury had to determine. This young lady put herself in the hospital. Thought that she saw something on TV that could mean that she needed help. Checked herself out of the hospital.
>
> . . .
>
> And I stand firmly by that opinion, that there's absolutely nothing exculpatory or arguably exculpatory in those records.
>
> . . .
>
> The petitioner has failed to prove how the [t]rial [c]ourt's order that the sealing of the victim's medical records caused prejudice.

This Court has reviewed the sealed records in question. We agree with the post-conviction court's conclusion that the victim's mental health records do not contain any evidence of prior violent acts by the victim and would, therefore, not be admissible to support the defendant's theory of self-defense. Consequently, we conclude the petitioner has failed to establish trial counsel was deficient in not renewing their argument regarding the victim's mental health records or that but for counsel's alleged deficiency, the result of the trial would have been different. The petitioner is not entitled to relief on this issue.

## C. Petitioner's Medical Conditions and Mental State

The petitioner also argues trial counsel was ineffective for failing to present evidence of the petitioner's medical conditions and mental state. If raised, the petitioner asserts his self-defense theory would have been stronger. The State contends the petitioner has failed to prove trial counsel was deficient.

At the evidentiary hearing, co-counsel testified she discussed the petitioner's medical condition with lead counsel because they wanted to ensure the petitioner's medical needs were taken care of during his confinement. However, co-counsel did not believe the petitioner had any mental impairments that prevented him from assisting in his representation. If she thought the petitioner's mental state was an issue, co-counsel testified she would have looked into developing that issue further. In addition, co-counsel was familiar with cognitive impairments due to diabetes and would have made an argument to the jury if she thought it was appropriate. Lead counsel testified he was aware the petitioner was "under the influence" on the day of the shooting and suffered from diabetes, but did not think it was "a major factor" to the defense. Because he believed those issues could "cut both ways," lead counsel decided to "go with a clean cut self-defense."

As noted above, trial counsel's testimony indicates they discussed the petitioner's medical conditions and mental state. However, they made a strategic and informed decision to go with a "clean cut" self-defense theory. Specifically, lead counsel believed these issues could "cut both ways" and did not want to jeopardize their case. The post-conviction court accredited the testimony of lead counsel and co-counsel, and nothing in the record preponderates against the findings of the post-conviction court. *See Tidwell*, 922 S.W.2d at 500. In addition, the fact that a trial strategy or tactic failed or was detrimental to the defense does not, alone, support a claim for ineffective assistance of counsel. *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992). Deference is given to sound tactical decisions made after adequate preparation for the case. *Id.* The petitioner is not entitled to relief on this issue.

## II. Appellate Counsel

## A. Failure to Raise Issue

The petitioner contends appellate counsel was ineffective for failing to raise the issue of the victim's mental health records on direct appeal. The petitioner argues this issue was stronger than the issues appellate counsel chose to raise, and, if included, there was a reasonable probability the petitioner's appeal would have been successful. The State contends the issue of the mental health records would not have been successful on appeal, and appellate counsel made a strategic decision to abandon the claim.

Co-counsel, who also represented the petitioner during the direct appeal, initially testified she raised the issue of the exclusion of the victim's mental health records on appeal. However, she later testified, although she could not recall the specific reasoning in this case, there are many reasons why she might leave an issue out of an appeal. Co-counsel stated, oftentimes, an issue may not appear "as strong as I felt like it was in trial," or she may be "concerned about the number of issues going up." The post-conviction court made the following findings:

> The [p]etitioner has failed to demonstrate ineffective assistance of trial or appellate counsel. Failure to preserve and/or assert all arguable issues on appeal is not per se ineffective assistance of counsel, since the failure to do so may be a part of the counsel's strategy of defense.
>
> . . .
>
> Appellate counsel made a tactical decision to raise only the strongest issues on appeal. All other issues were essentially "slam dunk losers" and unsupported by the evidence. There is absolutely nothing in the record to indicate that counsel's decision to forgo all other meritless issues raised at the evidentiary hearing was ineffective assistance.

The test used to determine whether appellate counsel was constitutionally effective is the same test applied to claims of ineffective assistance of counsel at the trial level. *Carpenter*, 126 S.W.3d at 886. To establish a claim of ineffective assistance of counsel, the petitioner must show that: 1) counsel's performance was deficient; and 2) counsel's deficient performance prejudiced the outcome of the proceedings. *Strickland*, 466 U.S. at 687; *see Carpenter*, 126 S.W.3d at 886.

When a petitioner bases his claim of ineffective assistance of counsel on counsel's failure to raise an issue on appeal, the petitioner proves deficient performance by showing

that "this omission was so serious as to fall below an objective standard of reasonableness under prevailing professional norms." *Carpenter*, 126 S.W.3d at 887. The petitioner satisfies the prejudice prong of the *Strickland* test by showing there is a reasonable probability, or "a probability sufficient to undermine the confidence in the outcome," that but for counsel's deficient performance, the result of the proceeding would have been different. *Strickland*, 466 U.S. at 694.

"Appellate counsel is not constitutionally required to raise every conceivable issue on appeal." *Carpenter*, 126 S.W.3d at 887; *citing King v. State*, 989 S.W.2d 319, 334 (Tenn. 1999). Generally, appellate counsel has the discretion to determine which issues to raise on appeal and which issues to leave out. *Carpenter*, 126 S.W.3d at 887. Thus, courts should give considerable deference to appellate counsel's professional judgment with regard to which issues will best serve the petitioner on appeal. *Id.* Appellate counsel is only afforded this deference, however, "if such choices are within the range of competence required of attorneys in criminal cases." *Id.*

When a claim of ineffective assistance of counsel is based on the failure of appellate counsel to raise a specific issue on appeal, the reviewing court must determine the merits of the issue. *Id.* "If an issue has no merit or is weak, then appellate counsel's performance will not be deficient if counsel fails to raise it." *Id.* Similarly, if the omitted issue has no merit then the petitioner suffers no prejudice from counsel's decision not to raise it. *Id.* If the issue omitted is without merit, the petitioner cannot succeed in his ineffective assistance claim. *Id.*

As previously discussed, the petitioner's claim that the victim's mental health records were admissible is without merit. The petitioner has failed to show he suffered any prejudice from appellate counsel's failure to include the issue of the victim's mental health records on appeal, and, therefore, he cannot succeed in his ineffective assistance claim. *Strickland*, 466 U.S. at 687. The petitioner is not entitled to relief on this issue.

## B.     Failure to Preserve Appellate Record

The petitioner argues appellate counsel was ineffective for failing to preserve the appellate record. Specifically, the petitioner contends appellate counsel failed to include the victim's mental health records in the technical record, preventing this Court from reviewing the records on direct appeal. The State contends this issue was waived for failing to include it in his petition for post-conviction relief or amended petition for post-conviction relief. We agree with the State.

While the petitioner challenged other aspects of appellate counsel's performance, the petitioner failed to challenge the completeness of the appellate record in his original

or amended petitions for post-conviction relief. Although the post-conviction hearing transcript indicates there was some discussion between post-conviction counsel, the State, and the post-conviction court about whether the victim's mental health records were made a part of the technical record, there is no indication the petitioner asked appellate counsel any questions about whether she confirmed the mental health records were included in the appellate record, and the post-conviction court made no rulings on the issue.

Because the issue was not before the post-conviction court and no ruling was rendered, we are precluded from review. Issues not raised in the post-conviction petition cannot be raised for the first time on appeal. *Cauthern v. State*, 145 S.W.3d 571, 599 (Tenn. Crim. App. 2004) ("[A]n issue raised for the first time on appeal is waived."). The petitioner has waived review of this issue.

## III.    Brady Violations

The petitioner contends the State committed several *Brady* violations by withholding exculpatory evidence material to his guilt and punishment. The State contends the petitioner has failed to show that any exculpatory evidence was withheld.

Suppression of evidence favorable to the defendant is a due process violation where the evidence is material to guilt or punishment. *Brady v. Maryland*, 373 U.S. 83, 87 (1963). The duty to disclose extends to all "favorable information" regardless of whether the evidence is admissible at trial. *Johnson v. State*, 38 S.W.3d 52, 56 (Tenn. Crim. App. 2012). In order to establish a violation based on the withholding of favorable evidence, the defendant must demonstrate that: (1) the defendant requested the information or that it was obviously exculpatory; (2) the State suppressed evidence in its possession; (3) the information was favorable to the accused; and (4) the information was material. *State v. Jackson*, 444 S.W.3d 554, 594 (Tenn. 2014). Evidence is material if there is a reasonable probability the result of the proceeding would have been different had the evidence been disclosed. *State v. Cureton*, 38 S.W.3d 64, 77 (Tenn. Crim. App. 2000).

In addition, "the prosecutor is responsible for 'any favorable evidence known to the others acting on the government's behalf in the case, including the police.'" *Strickler v. Greene*, 527 U.S. 263, 275 n.12 (1999) (citing *Kyles v. Whitley*, 514 U.S. 419, 437 (1995). However, the prosecution is not required to disclose information that the defendant either possesses or is able to obtain. *Johnson*, 38 S.W.3d at 56.

## A.    Victim's Mental Health Records

- 16 -

The petitioner argues the State committed a *Brady* violation by failing to obtain and disclose the victim's mental health records. The State contends the records were disclosed to the trial court and did not contain exculpatory or material information. We agree with the State.

Here, the petitioner has failed to establish the State committed a *Brady* violation. First, the petitioner did not request the information from the State. Moreover, the State did not suppress the information. The petitioner knew of the mental health records and, during the trial, requested an order from the trial court to obtain them. The trial court obtained the records, reviewed them in camera, and determined they were not relevant or admissible. After reviewing the sealed records, we conclude they do not contain information that is exculpatory, which would be necessary to grant post-conviction relief. Therefore, the petitioner is not entitled to relief on this issue.

**B.     Nail Clippings and Gunshot Residue Test**

The petitioner argues the State committed a *Brady* violation by failing to disclose that the victim's hands had been swabbed for gunshot residue and that nail clippings had been taken for testing. The State contends the petitioner has failed to show the testing would have resulted in favorable or exculpatory evidence.

First, we note in the petition for post-conviction relief, the petitioner does not argue the State committed a *Brady* violation in regards to the nail clippings and swabs. Instead, the petitioner argues trial counsel was ineffective for failing to request a mistrial after learning the medical examiner collected the evidence from the victim's body. At the evidentiary hearing, because co-counsel did not recall the nail clippings or swabs, the petitioner's questions focused on whether co-counsel would have hypothetically asked for a mistrial if she had been surprised by their existence at trial. On appeal, the petitioner has abandoned his ineffective assistance of counsel claim and, instead, argues the State improperly withheld the evidence, preventing the petitioner from having the items tested. The petitioner cannot raise a new argument for the first time on appeal. *Cauthern*, 145 S.W.3d at 599.

Furthermore, the petitioner failed to present the results of any such testing and, therefore, cannot establish prejudice. *See Black v. State*, 794 S.W.2d 752, 757-58 (Tenn. Crim. App. 1990); *Kelvin Winn v. State*, No. W2016-02200-CCA-R3-PC, 2017 WL 2211423, at *9 (Tenn. Crim. App. May 19, 2017), *perm. app. denied* (Tenn. Sept. 22, 2017). Accordingly, the petitioner is not entitled to relief on this issue.

**C.     Jasmin Harris Testimony**

The petitioner also argues the State committed a *Brady* violation by failing to disclose any agreement made with Ms. Harris in exchange for her testimony. The State contends the petitioner failed to show he is entitled to relief. We agree with the State.

"Evidence favorable to an accused includes that which may be used to impeach the prosecution's witnesses." *State v. Copeland*, 983 S.W.2d 703, 706 (Tenn. Crim. App. 1998) (citing *Giglio v. United States*, 405 U.S. 150 (1972)). If a witness has received or been promised some favorable consideration in exchange for testifying against a defendant, that information is exculpatory and can be used for impeachment purposes to attack the witness's credibility and motive for testifying. *Giglio*, 405 U.S. at 154-55; *Hartman v. State*, 896 S.W.2d 94, 101 (Tenn. 1995).

At the evidentiary hearing, the petitioner failed to question either lead counsel or the lead prosecutor about a potential agreement between Ms. Harris and the State. In addition, during co-counsel's testimony, the petitioner simply asked why she did not raise the issue of Ms. Harris's firearm charge during the trial. The petitioner has failed to provide any evidence proving that an agreement existed in exchange for Ms. Harris's testimony, that the petitioner requested information about an agreement, or that the State suppressed evidence of an agreement. The petitioner is not entitled to relief on this issue.

## IV. Judicial Bias

Finally, the petitioner argues the post-conviction court allowed prejudicial bias to permeate the petitioner's case. Specifically, the petitioner asserts the post-conviction court's questioning of Dr. Walker, favoritism toward trial counsel, and statement calling the post-conviction process a "game" are evidence of the post-conviction court's bias. The State contends this issue is waived for failing to timely raise it in a motion to recuse. We agree with the State.

"A motion for recusal should be filed when the facts forming the basis of that motion become known." *Bean v. Bailey*, 280 S.W.3d 798, 803 (Tenn. 2009) (citing *Davis v. Tenn. Dep't of Employment Sec.*, 23 S.W.3d 304, 313 (Tenn. Ct. App. 1999). Tennessee Supreme Court Rule 10B § 1.01 requires a party seeking recusal or disqualification of a judge "do so by a timely filed written motion." The failure to assert a timely motion to recuse "results in a waiver of a party's right to question a judge's impartiality." *State v. Antonio Freeman*, No. M2012-02691-CCA-10B-CD, 2013 WL 160664, at *5-6 (Tenn. Crim. App. Jan. 15, 2013), *no perm. app. filed* (quoting *Duke v. Duke*, 398 S.W.3d 665, 670 (Tenn. Ct. App. 2012)).

The petitioner did not file a motion seeking recusal or disqualification of the post-conviction court. Therefore, the petitioner's claim regarding judicial bias is waived.

- 18 -

However, we must address one of the comments made by the post-conviction court. During his oral findings, the post-conviction judge made the following statement:

> And it is something that bothers this [c]ourt and it's something that's unique to Tennessee. I practiced law in Houston for eight years. 23 felony courts. Not courts, 23 felony courts that dealt with felony cases. In the eight years in the State of Texas, Harris County, Texas, I may have seen three or four post-conviction petitions in 23 felony courts in eight years. But it's part of the game -- and I do use the word game -- that goes on in Tennessee, goes on in Shelby County, Tennessee. A person is tried. A person is tried and convicted by a jury, receives excellent representation from his lawyers, and will turn around on a post[-]conviction and sue a lawyer, in essence, and say, "My lawyers did a bad job. They did an absolutely horrible job for me and, therefore, I should be given a third trial."

Although we caution the post-conviction court against using such language in the future, the judge's comments regarding his beliefs about post-conviction petitions are not evidence of his bias against the petitioner in particular. In addition, we have reviewed the record in detail and, despite the petitioner's assertions, find no evidence of bias or prejudice against the petitioner during the evidentiary hearing. The petitioner is not entitled to relief on this issue.

## Conclusion

Based upon the foregoing authorities and reasoning, we affirm the post-conviction court's judgment denying the petitioner post-conviction relief.

_____
J. ROSS DYER, JUDGE